In re Atsushi ENDO, Debtor.

Julie Endo, Plaintiff,

v.

Atsushi Endo, Defendant.

Bankruptcy No. 03–15588.
Adversary No. A03–01324.

United States Bankruptcy Court,
W.D. Washington,
at Seattle.

Oct. 26, 2006.

Laurin S. Schweet, Law Offices of Laurin S. Schweet, Mercer Island, WA, for Plaintiff.

Cynthia A. Kuno, Crocker Kuno Ostrovsky LLC, Seattle, WA, for Defendant.

---

**MEMORANDUM DECISION[1]**

KAREN A. OVERSTREET,
Bankruptcy Judge.

This matter came before the Court for trial commencing on June 27, 2006, and continuing on various days until closing argument on September 12, 2006. This is an action by Julie Endo under Bankruptcy Code § 523(a)(15)[2] for a determination that certain obligations of the debtor arising from the parties' marital dissolution decree are nondischargeable. The total debt at issue as of July 1, 2006 exceeds $850,000.

## I. JURISDICTION

This court has jurisdiction of this matter pursuant to 28 U.S.C. § 1452 and 28 U.S.C. § 1334, and this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(J) and (O).

## II. BACKGROUND

### A. The Parties.

Plaintiff Julie Endo and defendant Atsushi "Michael" Endo were married on June 1, 1989. They have two children, Tasia Endo, age 19, and Chané Endo, age 15. They executed a Separation Contract dated December 30, 1998 ("Separation Contract") which provided for a division of their marital assets. Ex. P–11. The Separation Contract was incorporated into the Decree of Dissolution which was signed by the state court judge on December 30, 1998 (the "Divorce Decree"). Ex. P–10.

Pursuant to the Separation Contract, Julie Endo was awarded the following assets: (1) the residence at 13060 S.E. 47th Place, Bellevue, Washington (the "Residence"), which the parties stipulated had $143,000 of equity at the time of the divorce; (2) a $50,000 promissory note from Michael Endo (the "First Note"); (3) a $150,000 Promissory Note from Michael Endo (the "Second Note"), secured by a first position deed of trust on the Inverness lot awarded to Michael Endo; (4) a $401,914 promissory note from Michael Endo (the "Personal Note"); (5) a $287,881 promissory note from Superwood Corporation (the "Corporate Note"); (6) cash in the amount of $39,960 paid relative to the Corporate Note; (7) a joint account at Cascade Savings Bank containing funds in the approximate amount of $31,339; (8) Julie Endo's SeaFirst SEP account with $24,356 on deposit; (9) a Charles Schwab One Account in the amount of $51,796; (10) a Charles Schwab IRA in the amount of $25,719; and (11) a rollover of Michael

---

1. This disposition is not appropriate for publication and may not be cited except when pertinent under the doctrine of law of the case or the rules of res judicata, including issue and claim preclusion.

2. As the underlying bankruptcy was filed after the effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, all references to the Bankruptcy Code are to those provisions in effect prior to the new law.

Endo's Charles Schwab IRA in the amount of $110,829.48.

Under the Separation Contract, Michael Endo received the Inverness Lot, which the parties valued at that time at $230,500 and which was owned free and clear of liens, and the Superwood Companies, which are described in more detail below and which the parties valued for purpose of the their separation at $1,614,000.

In addition to Michael Endo's obligations under the notes described above, he was required to pay spousal maintenance for 36 months and child support. Ex. P–11. Both parties have the obligation under the Order of Child Support (Ex. P–12) to pay a share of their daughters' post-secondary education costs according to a formula in the order. Each daughter has a Charles Schwab trust account for which Julie Endo is the custodian and the Order of Child Support provides a mechanism whereby these funds may be accessed for higher education expenses at a private school. P–12, ¶ 3.14.

As of March 2003, Julie Endo had received payment in full on the First Note, the Second Note, and certain interest and principal payments had been made on the Personal Note and the Corporate Note. Michael Endo has paid all required maintenance and child support. In March of 2003, Michael Endo defaulted on the Personal Note and the Corporate Note. At issue in this case is his right to discharge the remaining balance of those two notes.

As of July 1, 2006, the unpaid balance on the Corporate Note was $265,141.22. Ex. P–40. The Corporate Note matured on December 31, 2003. Ex. P–14. Michael Endo personally guaranteed payment of the Corporate Note, which was also secured by a security interest in the assets of Superwood Corporation and a related company, Superwood Management Company, pursuant to the terms of a stock pledge agreement. Exs. P–15, P–16, P–17. The unpaid balance of the Personal Note as of July 1, 2006 was $592,427.24. Ex. P–40. The maturity date of the Personal Note is April 1, 2009. Ex. P–13. The unpaid balance of each note includes default simple interest of 12% per annum from the default in March 2003. The nondefault rate under both notes is 6% per annum.

## B. *Formation of the Superwood Companies.*

Michael Endo was introduced to the log export business in 1979 when, while working as a grill cook at a Japanese restaurant, he met Masao Kennotsu, the owner of Ken Pac, a log export business. Mr. Kennotsu hired Michael Endo at age 21 initially as a chauffeur. Over a period of years from 1981 to 1991, Mr. Endo worked his way up at Ken Pac ultimately to become its sales manager, negotiating the buying and selling prices of raw logs. By the time Michael Endo left Ken Pac, after Mr. Kennotsu's death, he was an experienced and successful salesman who had formed significant business relationships with Ken Pac's major customers in Japan.

Upon leaving Ken Pac, Mr. Endo decided to form his own log export business and on February 12, 1992, he formed Superwood Corporation for that purpose. Superwood Corporation's customers were the same customers Mr. Endo had worked with at Ken Pac. Mr. Endo's focus was slightly different than the focus of Ken Pac, which was on log trading. Mr. Endo's focus was as a log shipper, speculating on raw log prices between the time of purchase and sale of the logs. Superwood Corporation was the log selling entity of Mr. Endo's operations. A second corporation, Superwood Management Company ("SMC"), was formed on July 14, 1992 (Ex. P–4), for the purpose of selling bundled and packaged building materials

(cut lumber products) to Japanese customers. To satisfy certain visa requirements, Michael's Endo's father was named the owner of 51% of the SMC stock and Michael Endo owned the remaining 49% of the stock.

Although Superwood Corporation was formed during the parties' marriage, Michael Endo owned 100% of the stock of that entity. Julie Endo served as secretary and worked for the company for a brief period setting up the new company's accounting systems, paying its bills and hiring a bookkeeper. She ultimately ceased working for Superwood Corporation so that she could devote full time to raising the parties' two children.

The business of the Superwood companies grew and in approximately July of 1994, the companies moved into rented office space at Nine Lake Bellevue Drive in Bellevue, Washington. The companies operated there for eight years. For a few of those years, Superwood Corporation's business grew dramatically. Between 1996 and 1998, the number of employees grew to five and the company's sales volume ranged from $74 million to $90 million per year. Michael Endo traveled to Japan approximately 10 times a year to visit and meet with customers, and his Japanese customers also traveled to Bellevue to meet with Mr. Endo. All of these occasions involved entertainment such as dining out, cultural excursions, and lots of golf. Typically while in Japan, Mr. Endo's clients paid for his entertainment activities. Mr. Endo was expected to entertain his Japanese clients at Superwood Corporation's expense when they visited the United States.

With the success of Superwood Corporation, the Endo family enjoyed a high-income lifestyle. They extensively remodeled the Residence, enrolled their eldest daughter in an exclusive private school, and established trust accounts for each of their daughters and retirement accounts for themselves.

Although the business of Superwood Corporation proved successful, the operations of SMC were not successful and it was closed in 1998. Exs. D–2, D–7. Due to a number of economic factors, the sales volume of Superwood Corporation also began to decline in 1997 and in the year 2001 Superwood Corporation suffered a net loss of just over $1 million. The same year, Michael and Julie Endo separated and began living apart.

By 2001, although the First and Second Notes had been paid in full, Michael Endo was making payments of $3,300 per month on the Corporate Note and was scheduled to begin making monthly payments of $5,000 on the Personal Note on October 1, 2001. In addition, there was a balloon payment due on the Corporate Note on December 31, 2003.

Michael Endo took the position that given the economic circumstances of his business, he was not able to make the continuing monthly payments on the notes. *See* Ex. D–11. The parties commenced negotiations to restructure the terms of both outstanding obligations. With differing views of the actual performance and prospects of Superwood Corporation, however, their settlement negotiations proved acrimonious and ultimately unsuccessful. *See* Exs. D–16, D–17, D–18A. Some of the discussions centered on how an unexpected tax refund due Superwood Corporation in the amount of $362,000 ought to figure in the settlement negotiations. *See* Exs. D–12, D–15. Ultimately, however, Mr. Endo retained the full amount of the tax refund in the business.

Rather than face the prospect that Julie Endo might seek to exercise her security interest against the assets and stock of

Superwood Corporation, Mr. Endo decided to cease business activities in Superwood Corporation and form a new corporation to continue his log export activities. At Michael Endo's direction, Bruce Zavon, the companies' financial advisor and attorney, filed articles of incorporation for Superwood Management Company ("Superwood II") on April 16, 2003. Exs. D–22, D–23, D–24. Twelve days later, Michael Endo filed for personal bankruptcy protection under Chapter 7.

## C. *Bankruptcy Proceedings of Michael Endo and Superwood Corporation.*

Michael Endo filed a chapter 7 bankruptcy proceeding on April 28, 2003 and Robert Steinberg was appointed as the trustee. Mr. Endo did not disclose the existence of Superwood II on schedule B showing his personal property. Instead, he listed the defunct Superwood Corporation with the notation "business is closing—(fully secured), zero value." With the exception of the deed of trust holder on Mr. Endo's condominium and a credit card claimant with a claim of $18,000, Julie Endo was the only creditor in Michael Endo's chapter 7 proceeding. Mr. Endo also listed an unsecured debt in the amount of $233,000 owed by him to Superwood Corporation.

By letter dated May 16, 2003, counsel for Michael Endo notified counsel for Julie Endo that the business of Superwood Corporation had ceased and that the company was voluntarily surrendering its property to Ms. Endo. Ex. D–20. By letter dated May 21, 2003, counsel for Michael Endo notified the landlord of Nine Lake Bellevue Drive that Superwood Corporation was surrendering the premises. Ex. D–21. Kathy Saulter, the property manager of the property, testified that she believed Superwood vacated the premises on or about May 3, 2003. She also testified that she subsequently walked through the property with Julie Endo and that the personal property left behind by Superwood Corporation was of little value.

Meanwhile, after laying off Superwood Corporation's employees, returning two corporate vehicles to the agencies that financed them, and abandoning the hard assets of Superwood Corporation, Michael Endo was up and running his business under the name of Superwood II with the same customers and suppliers with whom he had always dealt, running the business from his condominium. He obtained a $30,000 loan from Pacific Lumber & Shipping Co. on May 30, 2003. Exs. D–26, Ex. P–19. Pacific Lumber & Shipping Co. had always been one of Superwood Corporation's major suppliers. The loan was secured by the assets of Superwood II. In addition, as of June of 2003, Michael Endo negotiated a line of credit with Pacifica Bank in the amount of $250,000, which was secured by the assets of Superwood II and personally guaranteed by Mr. Endo. Ex. P–18. Pacific Lumber & Shipping Co. subordinated its security interest in Superwood II's assets to the new security interest of Pacifica Bank. *Id.* In August of 2003, Superwood II obtained another loan in the amount of $15,000 from Pacific Lumber & Shipping Co. Ex. P–27.

On July 15, 2003, Julie Endo timely filed a complaint objecting to the discharge of Michael Endo's obligations to her. Mr. Endo received a general discharge on August 8, 2003. On August 28, 2003, the case was closed after the trustee filed a report of no distribution. The case was reopened, however, on February 5, 2004, on the motion of the United States Trustee indicating that there might be assets (which are not identified in the motion) to administer. The case was re-closed on August 5, 2005, after the trustee's second report of no distribution.

On October 3, 2003, Mr. Endo signed the petition for Superwood Corporation, which filed a chapter 7 proceeding with schedules showing only four creditors with aggregate debt of $85,391.29.[3] The case was assigned case number 03–22865 and assigned to Judge Steiner. On January 12, 2006, the case was closed after the trustee filed a report of no distribution.

## D. Operation of Superwood II.

Since approximately April of 2003, Michael Endo has continued to operate Superwood II. Exhibit P–18 indicates that prior to 2006, Superwood II had borrowed and repaid $1,385,778.10 on its line of credit with Pacifica. As of the time of trial, Superwood II had taken no advances on the line of credit in 2006 and the account had a zero balance. Ex. P–18.

In March of 2005, Mr. Endo refinanced his condominium to obtain $70,000 in equity which he then loaned to Superwood II. Exs. D–38, D–39. On behalf of Superwood II, Mr. Endo signed a Promissory Note dated March 31, 2005, evidencing the debt of Superwood II to him and the repayment terms. Ex. P–47. According to the testimony of Ms. Kishimoto, Michael Endo's assistant, Superwood II is repaying this loan by monthly payments to Mr. Endo in the amount of $767.28.

On April 11, 2005, Mr. Endo negotiated a loan in the amount of $100,000 to Superwood II from Naodan Chartering, Inc., a ship broker that had done business with Superwood Corporation. The loan was to bear interest at 8% per annum and be payable in full on April 10, 2006. Ex. D–33. Daniel Valente, an employee of Naodan testified at trial that this loan has not been repaid by Superwood II, but that Naodan had not commenced any collection action to enforce the loan. Mr. Valente also testified that "until recently", he was still doing business with Mr. Endo, having completed 10 contracts since 2004. Mr. Valente was not willing to say one way or the other whether he would continue to do business with Mr. Endo or Superwood II in the future.

Exhibit D–7, a summary of Superwood II's operations prepared by Bruce Zavon, shows that since the commencement of its operations, Superwood II has lost money. Superwood II lost slightly over $7,000 in the partial year 2003, $275,000 in 2004, and approximately $48,000 in 2005. Despite the losses in 2004 and 2005, Superwood II paid wages to Mr. Endo of $90,882 and $79,721, respectively, in those years. Although tax returns for Superwood II filed for 2003, 2004 and 2005 are in evidence as Ex. D–7, no financial statements for 2006 were offered at trial. Mr. Endo testified that Superwood II's losses were attributable to the significant reduction in sales due to the bankruptcy of two of his major customers, an increase in freight charges, and the failure to cut costs of operation quickly enough in response to the reduction in sales.

## E. Assets, Liabilities, Income and Expenses.

### 1. Michael Endo.

Michael Endo is 48 years old. He came to live in the United States in 1975 from Tokyo, Japan, and is a United States citizen. His highest level of education is an Associate Arts degree from Highline Community College, which he was awarded in 1981. Despite Mr. Endo's limited educational background, he became quite successful as a sales manager for Ken Pac

---

**3.** The Court may take judicial notice of the pleadings filed in that case. Rule 201, Fed. R.Evid.

and as the owner of his own log shipping company.

In July of 2005, Michael Endo married a Japanese citizen, Kyako Endo, who resides near Tokyo, Japan. Ex. P–37. Mr. Endo testified that his wife is a flight attendant for United Airlines and that he is able to see her approximately a week a month when she is in the United States. He also visits her when he is in Japan on Superwood II business. They do not own any property together according to Mr. Endo's testimony. Mr. Endo borrowed $16,000 from his wife in 2006, but testified that he did not know the source of those funds and assumed they were from her personal savings.

Mr. Endo owns a condominium with a value of $231,000 as of March 22, 2005, according to a refinance appraisal submitted into evidence as Ex. D–37.[4] In a personal financial statement submitted to Bay Bank in May of 2006, Michael Endo valued his condominium at $325,000.[5] At trial, he testified that he believed the value of the condominium was approximately $300,000. In February of 2005, there was a first mortgage against the condominium in the approximate amount of $198,000. In March of 2005, however, Mr. Endo refinanced his condominium to obtain $70,000 in equity, which he then loaned to Superwood II. Exs. D–38, D–39. That refinancing increased the first mortgage against his condominium to $271,000. *Id.* A statement dated April 30, 2006, shows that the principal balance of this mortgage is still $271,000. Ex. D–40.

Mr. Endo also has a personal bank account at Bay Bank which he testified had $4,100 on deposit as of the time of his testimony. *See* D–42 (prior balance). In addition, Mr. Endo has a Charles Schwab retirement account with a balance of $27,172 as of March 31, 2006. Ex. D–43. He testified that he had not made a deposit to that account for over a year. Michael Endo has a Japanese annuity that is similar to social security in the United States. Julie Endo submitted Ex. P–36 showing $21,558 in that account as of June 14, 2006. Mr. Endo testified that he pays approximately $1,200 per year into this account. Finally, Mr. Endo owns Superwood II. The value of that company is discussed below.

With the exception of the mortgage on the condominium, Mr. Endo has the following personal liabilities: (i) $29,000 owed his parents for a loan they made to him so he could pay off a Bay Bank loan of $20,000; (ii) a Visa card account (used for business) with a balance of $15,000; (iii) an American Express card account with a balance of $2,000; (iv) a Mastercard account with a balance of $1,300; (v) $16,000 owed his wife for a loan she made in August of 2006; and (vi) legal fees and costs owed to Crocker Kuno and fees owed to Bruce Zavon in an unspecified amount.

Ms. Kishimoto testified that from January through July of 2006, Mr. Endo had been paid approximately $32,000 in salary, net of deductions, which equates to $4,571 per month. In addition, Ms. Kishimoto testified that Michael Endo receives a payment of $767.28 per month from Superwood II as a repayment of the $70,000 loan he made to the company. Mr. Endo testified that he also receives additional monies from wagering on golf games in which he plays; these amounts, which can be in the

---

4. The Separation Contract awarded a lot in Inverness to Michael Endo, but that property was sold before trial and both Mr. Endo and Julie Endo received proceeds from that sale.

5. Mr. Endo attempted to distance himself at trial from this valuation, claiming that his assistant, Ms. Kishimoto, completed the financial statement and inserted $325,000 in the form.

hundreds of dollars on a single game, are not documented or reported to the Internal Revenue Service as income. Therefore, the only evidence produced at trial of the amount of these winnings was Mr. Endo's estimate. Mr. Endo testified that his wife currently earns $35,000 annually as a flight attendant for United Airlines and that they keep their income and expenses separate.

Mr. Endo was asked to compare his current monthly expenses to the Schedule J that he filed with his bankruptcy petition in April of 2003. Schedule J from his petition is contained in Exhibit P–7. According to Schedule J, Mr. Endo claimed monthly expenses of $8,474 when his petition was filed, with monthly income of only $5,000. At trial, Mr. Endo testified to having current monthly expenses of $7,164 and net income of $5,338.28 (salary of $4,571 plus loan repayment of $767.28). Based upon these figures, his monthly expenses are compared in the table below.

| Expense | Sch. J | Testimony |
|---|---|---|
| Home mortgage | $1,738 | 1,648 |
| Real estate taxes | (incl in mort) | 240 |
| Real estate insurance | (incl in mort) | 241 |
| Electricity, heating | 65 | 50 |
| Water sewer | 35 | 65 |
| Telephone | 25 | |
| Other | 36 | 95 |
| Home Maintenance | 50 | 50 |
| Food | 250 | 350 |
| Clothing | 250 | 250 |
| Laundry and dry cleaning | 50 | 50 |
| Medical and dental | 500 | 200 |
| Transportation (not incl. car payments) | 25 | 200 |
| Recreation, clubs, magazines | 200 | 325 |
| Charitable contributions | 0 | 0 |
| Insurance | 0 | 0 |
| Taxes (not deducted from wages) | 0 | 0 |
| Installment payments | 0 | 0 |
| Alimony, maintenance | 3,250 | 0 |
| Payments for dependents not at home | 250 | 562.50 (child support, Chané) |
| Payment for daughter's tuition | 1,750.00 | 687.50 (Tasia) |
| Golf | | 900 |
| Total expenses | $8,474.00 | $5,914.00 |
| Net Income | $5,000.00 | $5,338.28 |
| Monthly Loss | ($3,474.00) | ($ 575.72) |

As of the time Schedule J was filed, Mr. Endo was showing a net monthly loss of $3,474. According to his testimony at trial, he has a net monthly loss of $575.72.

2. *Julie Endo.*

As of the time of trial, Julie Endo owned the following assets: the Residence, a Schwab money market account with $7,000 on deposit, a Schwab IRA with an account balance of $224,000, a Bank of America account with approximately $6,000 on deposit (checking and savings), art valued at approximately $10,000, and the Personal Note and the Corporate Note. Julie Endo is also the custodian of her daughters' investment accounts. Exs. D–46, D–47.

The parties dispute the value of the Residence. Julie Endo contends that the value of the Residence is $431,725, after deducting costs of sale and the mortgage balance of $128,000. *See* Ex. P–24. Ms. Endo also testified that the Residence is in need of expenditures totaling nearly $100,000 for deferred maintenance and repairs. Ms. Endo's valuation in Ex. P–24, however, which is based upon an opinion by John L. Scott realty, does not show any deduction for repairs or maintenance expenses.

Michael Endo's valuation of the Residence is based upon the opinion of Djuna Basconcelo, a real estate salesperson affiliated with Keller Williams Realty. Ms. Basconcelo's declaration as to value is Exhibit D–68. She opines that the Residence is worth $630,000 to $660,000, taking into account the cost of replacing the roof ($12,-000–$16,000).

Neither of the parties called a real estate salesperson or appraiser to testify about the value of the Residence. Based upon the evidence, it is clear that Ms. Endo has, at a minimum, in excess of $400,000 in equity in the home.

As of the trial, Julie Endo was not employed. Although Ms. Endo was born in Hong Kong, she has been in the United States since age two and has lived in the United States continuously since that time. She is fluent in Chinese and obtained an undergraduate degree from the University of Washington in 2000 and a Masters Degree in social work from the University of Washington in 2002. She testified that she has mailed out resumes to many prospective employers in the social work area, but has not been offered a job in that field. She estimated that the highest hourly wage she could expect to be paid without prior experience in social work is $14. Ms. Endo also attended beauty school in order to become a licensed esthetician, which is a person who is licensed to do manicures, pedicures, and makeup. She has never been employed in any job in this field, however. Ms. Endo is now enrolled at Bellevue Community College pursuing a degree in Graphic Design and attends five hours of classes per week. She has no experience in this field. Ms. Endo expects to get her graphic design certificate in the fall of 2007.

Julie Endo prepared Exhibit P–42 as a statement of her monthly expenses.[6] Exhibit P–42 lists the following expenses:

| | |
|---|---|
| Home Mortgage | 1500.77 |
| Utilities | 428.64 |
| Home maintenance | 1051.52 |
| Retail Purchases | 305.96 |
| Food | 856.25 |
| Clothing | 400.36 |
| Medical/dental | 750.96 |
| Auto | 159.57 |
| Recreation, etc. | 30.42 |
| Charitable Contributions | 46 |
| Insurance | 445.28 |
| Other | 77.67 |
| Taxes | 23.08 |
| Julie's education | 203.12 |
| Tasia's education | 2,387.72 |
| Support paid to others | 200 |
| Travel expenses for Tasia | 46.83 |
| Professional Fees (not incl. Legal) | 208.33 |
| Expenses for Chané's school | 24.01 |
| Chané's allowance | 50 |
| Expenses for Chané's activities | 218.82 |
| Total | $9,415.31 |

Julie Endo calculated the monthly payment of $2,387.72 for daughter Tasia's education by starting with the amount of tuition prepaid for four years amortized on a monthly basis. Ms. Endo has also included a significant amount for home maintenance. She currently receives $1250 per month in child support from Mr. Endo,

---

**6.** In the discovery process, Julie Endo also completed a hypothetical Schedule J showing her monthly expenses. These expenses, total-ing $9,629.93 per month, are shown in Ex. D–63.

leaving a monthly shortfall of income to cover expenses in the amount of $8,165.31.

### III. ISSUE

The sole issue in the case is whether Michael Endo's indebtedness under the Personal Note and the Corporate Note is nondischargeable under Bankruptcy Code § 523(a)(15).

### IV. DISCUSSION

A. *Burden of Proof.*

■ Julie Endo, as the plaintiff, has the burden of showing (1) that the complaint was timely filed, and (2) that the obligations arise in connection with a dissolution. Ms. Endo satisfied that burden at trial. The burden then shifts to Mr. Endo to prove by a preponderance of the evidence that (i) he does not have the ability to pay the debts from his income or property that is not reasonably necessary to be expended for maintenance or support of himself or any dependent; **or,** (ii) discharging the debt would result in a benefit to Mr. Endo that outweighs the detrimental consequences to Julie Endo. *In re Jodoin,* 209 B.R. 132 (9th Cir. BAP 1997). The Court may, in its discretion, order that all or part of the debt be discharged and may set repayment terms if appropriate. *In re Myrvang,* 232 F.3d 1116, 1121 (9th Cir.2000)(permitting repayment over a period up to five years). The benefit to the debtor of a discharge and its detriment to a former spouse must be weighed as of the time of trial and projected into the future. *In re Jodoin,* 209 B.R. at 142; *Wellner v. Clark (In re Clark),* 207 B.R. 651, 656 (Bankr.E.D.Mo.1997). In examining the parties' financial circumstances, the Court may consider, without limitation, present, continuing, and future financial obligations, employability, household and business expenses, and income. *In re Clark,* 207 B.R. at 656.

■ There are two tests the Court may apply in determining whether debt under Section 523(a)(15) should be discharged: the "disposable income test" and the "totality of circumstances" or "balancing" test. Under the disposable income test, the Court must determine whether Michael Endo has the ability to pay the debt under Section 523(a)(15) by examining his disposable income, including all sources of income. The Court may adjust expenses in determining the amount of disposable income using the "reasonably necessary" standard typically applied in chapter 13 cases. *In re Romer,* 254 B.R. 207 (Bankr. N.D.Ohio 2000).

■ The Court must look at a number and variety of factors when applying the "totality of circumstances" or "balancing of equities" test. These factors may include, but are not limited to, the following:

1. the amount of debt involved, including all payment terms;

2. the current income of the debtor, objecting creditor and their respective spouses;

3. the current expenses of the debtor, objecting creditor and their respective spouses;

4. the current assets, including exempt assets of the debtor, objecting creditor and their respective spouses;

5. the current liabilities, excluding those discharged by the debtor's bankruptcy, of the debtor, objecting creditor and their respective spouses;

6. the health, jobs skills, training, age and education of the debtor, objecting creditor and their respective spouses;

7. the dependents of the debtor, objecting creditor and their respective spouses;

8. any changes in the financial condition of the debtor, objecting creditor and their respective spouses;

9. the amount of debt which has been or will be discharged in the debtor's bankruptcy;

10. whether the objecting creditor is eligible for relief under the Bankruptcy Code; and

11. whether the parties have acted in good faith in the filing of the bankruptcy and the litigation of the (a)(15) issues.

*In re Molino*, 225 B.R. 904 (6th Cir. BAP 1998).

B. *Michael Endo.*

■ Michael Endo's obligation to pay Julie Endo maintenance ended in 2001. In addition, his obligation to pay monthly child support of $687.50 for Tasia *(see* Ex. P–15) terminated in January of 2005 when Tasia turned 18. Mr. Endo has continued to pay $687.50 for Tasia, which amounts can presumably be counted toward his obligation to pay his share of her college expenses according to Section 3.14 of the Order of Child Support, Ex. P–15. But Mr. Endo is essentially estranged from both of his daughters and the primary responsibility, financial and otherwise, of taking care of Tasia and Chané has fallen to Julie Endo. The state court may at some point in the future require Mr. Endo to share more of the burden of his daughters' expenses, but it is unlikely he will accept more of the burden voluntarily. If Mr. Endo's financial contribution is to increase, it will require litigation at Julie Endo's expense. Consequently at present, other than the $1250 he pays monthly to Julie Endo for his daughters, Mr. Endo is responsible only for himself.[7]

Although Mr. Endo's educational credentials are far from impressive, the Court is persuaded that he is a shrewd and successful businessman. He took a start-up export business which he ran out of his home to a business that achieved sales of over $100 million in its best year. Although the evidence shows a downward trend in the financial performance of the three Superwood companies since 1995 (Ex. D–7), Mr. Endo has taken significant steps to position himself to resume profitability through the operation of Superwood II.

By terminating the business of Superwood Corporation (at least on paper) and resurrecting that business under the same name in the form of Superwood II, Mr. Endo was able to rid the business of the security interest of Julie Endo, which attached to all of the assets and the stock. Free of that security interest, Superwood II was able to obtain a new line of credit with Pacifica Bank. By putting Superwood Corporation through bankruptcy, Mr. Endo was able to eliminate one of the largest unsecured claims against the business, that being the debt to Julie Endo under the Corporate Note. Thus, Superwood II enjoys a much improved balance sheet over that of Superwood Corporation as of 2003, when its bankruptcy proceeding was commenced.[8]

As noted above, Michael Endo has been able to attract the credit he needs to conduct business despite a history of losses.

7. According to his testimony, he provides no financial support to his current wife.

8. Julie Endo contended at trial that these acts by Mr. Endo in terminating the business of Superwood Corporation and moving the same operations to Superwood II were fraudulent as to her. Mr. Endo responded, that with no noncompete agreement in place, his actions were lawful. The Court has considered the evidence on these questions only as it might pertain to Mr. Endo's good faith, but any claim of fraud is not part of this litigation.

For the most part, his financers are also his major shipping suppliers who may recoup their loans through their continued business with Superwood II.[9] Pacifica Bank funds Superwood II through a relatively risk free letter of credit arrangement. As previously noted, despite losses in the operation of Superwood, Mr. Endo has been able to consistently pay himself a substantial salary. Ex. P–3. The new Superwood II has reduced its expenses dramatically, returning once again to a one-employee business operated out of Mr. Endo's home.

Most importantly, Superwood II's operations appear to be improving. In the first nine months of its operations, Superwood suffered a loss of only $7,398. Ex. P–3, D–7. In 2004, it increased sales to $21 million, but suffered a loss of $271,097. For 2005, with lower sales of $13,170,304, Superwood suffered a loss of only $48,090, after payment of salaries for individuals who are no longer employees of $26,007 and after payment of nearly $80,000 to Mr. Endo. Ex. P–3. Thus, even a small increase in sales or a reduction in the significant meals and entertainment expenses incurred by Superwood II, would generate a small profit for the company. The financial statements reveal very significant commissions, which were not completely explained at trial and which likely can be reduced to further improve Superwood II's profitability.

There was considerable testimony produced at trial concerning Superwood II's expenses for meals and entertainment, which totaled $21,874 in 2005 and included a variety of expenses such as coffee, restaurant meals, groceries, golf, etc. Michael Quackenbush, Julie Endo's expert at trial, advocated that a portion of these expenses should be reallocated and treated as additional income to Mr. Endo because they were not adequately documented as legitimate business expenses. Mr. Endo defended Superwood's meal and entertainment expenses on the ground that tradition and culture dictate that these expenses are necessary to maintaining lucrative Japanese client relationships. While the Court agrees that the documentation does not support the business nature of all of the expenses (see Ex. P–44), whether the expenses are legitimate business expenses is for the IRS to determine. What is important to the issues in this case is that these expenses are excessive given the financial condition of the business.

The documentation in Exhibit P–44 reveals that Mr. Endo eats out on a continuous basis and spends a great deal of time on the golf course. In light of that, there are some excesses in Mr. Endo's personal budget. For example, his personal budget includes $325 per month for recreation, $900 per month for golf, and $350 per month for food for himself. Because Superwood II pays for Mr. Endo's golf and substantial meals out, Mr. Endo's personal budget for these expenses should be reduced by $900 (golf), $325 (other recreation), and $100 (food) for a total of $1,325. Mr. Endo also testified that a condominium assessment of $241 per month shown on Schedule J has terminated and should be removed from his monthly expenses. These reductions bring Mr. Endo's monthly expenses to $4,348. Assuming no increase in net income, Mr. Endo would have approximately $1,000 of monthly net income.

This Court concludes that the current monthly salary being paid to Mr. Endo is not reflective of what he will accomplish through the operation of his business in the future. Based upon past historical performance of the Superwood companies, and the amounts paid to Mr. Endo during

9. For example, Superwood II is paying a 1.25% commission to Naodan Chartering, Inc. on some freight transactions. See Ex. P–3.

good and bad years, the Court concludes that Mr. Endo will have, on average, future net income of $100,000 per year. That will generate $8,300 per month on a net basis. In addition, according to Exhibit P–47, payments of $767.29 from Superwood II to Mr. Endo are to continue until 2014. With this additional source of income, Mr. Endo would have approximately $4,700 per month net income available for payment to Julie Endo.

Julie Endo contends that $687.50 being currently paid by Mr. Endo for Tasia's educational expenses is a voluntary payment by Mr. Endo which he could terminate at any time. If he terminated those payments, he would have that additional amount in net monthly disposable income. Likewise, at the point in time when the monthly child support payments for Chané of $562.50 are no longer required by the Order of Child Support, Mr. Endo's disposable income will increase by that amount.

The foregoing analysis demonstrates that a complete discharge of the indebtedness under the Personal Note and Corporate Note is not appropriate, because the detriment to Julie Endo of probably losing her home and of struggling to continue to pay the expenses of herself and her two daughters, despite Mr. Endo's financial ability to pay her, far outweighs the benefit to Mr. Endo.

C. *Julie Endo.*

■ Although Julie Endo has substantial assets, given the equity in her home and cash assets, she has relatively little earning potential. As of the trial, she was not working and testified that she was spending her cash assets to pay her expenses. The Court concludes that except for the $1,250 per month Michael Endo pays for child support and Tasia's college expenses, Julie Endo bears the primary responsibility for Chané's living expenses

and for a good chunk of Tasia's expenses as well. Ms. Endo testified that since 2002, her cash assets have been reduced by approximately $250,000. Nearly one-half of the reduction in her cash assets, however, resulted from Ms. Endo's decision in August of 2004 to prepay Tasia's college tuition at Santa Clara University in the amount of $108,540 pursuant to a Guaranteed Tuition Plan. *See* Ex. P–38. Ms. Endo paid this amount from her own funds. Michael Endo argues that Julie Endo has a right to reimbursement for all or a portion of that amount pursuant to Section 3.14 of the Order of Child Support, Ex. P–15. That section authorizes the expenditure of up to one-third of the amount of Tasia's investment account to pay for expenses at a private college. Santa Clara is a private college therefore Ms. Endo may indeed have a right to some reimbursement from Tasia's investment account for the prepaid tuition. That is for the state court to determine, however, not for this Court.

Julie Endo has not made reasonable efforts to earn her own income to pay at least some of her expenses. When her efforts to find work in the field of social work were unsuccessful, she should have made efforts to find employment in some other field. Ms. Endo has an undergraduate college degree that should be worth something. Graphic design, Ms. Endo's current career endeavor, may or may not be the answer to her career woes. With only one child living at home, she should at a minimum be able to find part time work to provide additional income. The Court concludes that Ms. Endo should be able to earn as much as $20,000 annually with her current educational credentials.

In addition, Julie Endo lives in a five-bedroom house worth over $600,000. Given her lack of employment, this is a house she can no longer afford. Her testimony was that she wanted to keep the Residence

so she could leave it to her daughters. This is an unrealistic goal given Ms. Endo's circumstances. Julie Endo has some difficult decisions ahead—she must participate in the process of making her own ends meet by reducing her expenses and finding gainful employment. Accordingly, there is a point at which providing some discharge of indebtedness to Michael Endo outweighs the detriment to her.

D. *Partial Discharge Analysis.*

■ In this case, the Court has determined that Mr. Endo will have $4,700 per month in future net earnings from which he can pay Julie Endo. The question is for how long should Mr. Endo be required to pay that amount. In *Graves v. Myrvang (In re Myrvang)*, 232 F.3d 1116 (9th Cir. 2000), the Ninth Circuit Court of Appeals affirmed the authority of the bankruptcy court to order partial discharge of debts under Section 523(a)(15), and specifically sanctioned a five-year repayment of the nondischargeable portion of the debt in that case. To date, no Ninth Circuit opinion holds that a longer period of repayment is not permissible. In student loan partial discharge cases, the Court typically looks at the debtor's earning potential to retirement age of 65.

In this case, the Court believes that the proper period of repayment is 10 years. At that point, Mr. Endo will be 58 years old and whatever earning potential he has should be devoted to funding his own retirement years. There is no evidence that he has any retirement other than his Charles Schwab Retirement account (Ex. D–43) and his Japanese annuity account (Ex. P–36). These two retirement accounts total approximately $40,000. Ten years of payments at $4,700 per month totals $564,000. In addition, the Court will treat Mr. Endo's payment of $1,250 per month for Chané (child support) and Tasia

(educational expenses) as nondischargeable. The payments of $562.50 per month for Chané are nondischargeable child support payments in any event. Once these payments are no longer required, however, $562.50 in additional disposable income will be available to Mr. Endo. Mr. Endo may continue to pay those amounts as a contribution to Chané's educational expenses, if Chané elects to attend college, or that amount will be added to $4,700 payment for Ms. Endo's benefit. Similarly, the payments of $876.50 for Tasia's college education will represent additional disposable income to Mr. Endo once those college expenses are no longer necessary.[10] During the ten year period set for repayment $876.50 will be treated as a contribution to Tasia's educational expenses or that amount will be added to the monthly amount paid to Julie Endo for her own benefit.

The total debt under the Corporate Note and the Personal Note as of July 1, 2006 was $857,568.46. The Court finds that $564,000 of that amount is nondischargeable. That amount shall be payable to Julie Endo at $4,700 per month until paid in full. In addition, the Court finds that an additional $1,200 per month, representing amounts currently being paid for child support for Chané and educational expenses for Tasia is nondischargeable. In the event that Mr. Endo is no longer required to pay all or any portion of those amounts toward child support or educational expenses, the amounts no longer required to be paid shall be added to the monthly amount being paid to Julie Endo. Over a ten year period these amounts will total $150,000.

The total nondischargeable portion of the debts is $714,000. That amount may be prepaid at any time without penalty and shall not bear interest unless there is a default. In the event of a default, the

10. Tasia is currently a junior at Santa Clara.

296

entire balance of the judgment shall be accelerated and due and payable in full, and will accrue interest at the federal judgment rate from the time of the default.

## CONCLUSION

A nondischargeable judgment shall be entered in favor of Julie Endo in the amount of $714,000, subject to the terms stated above. Michael Endo's remaining obligations under the Personal Note and the Corporate Note are discharged. Plaintiff should submit an order and separate judgment consistent with the Court's findings of fact and conclusions of law. The order and judgment should specifically state that nothing in this Memorandum Decision or in the order or judgment is intended to in .any way limit or usurp the power of the state court to make appropriate orders in connection with the parties' divorce proceeding.